This is 20-1831 Grecia v. Samsung Electronics. Mr. Worzen, whenever you're ready. Thank you. Good morning, Your Honors. Matt Worzen for William Grecia. Claim 1 of the 308 patent is eligible for patent because... Mr. Worzen? Yes. This is Judge Wallach. I have a couple of little questions about Claim 1. Samsung says that Claim 1 doesn't require anything other than a conventional computer and network components operating according to their ordinary functions such as apparatus, a CPU, a data store, a memory, a storage, a database, and the Internet. Are any of those components not well-known in the prior arc? That's a yes or no. They are not well-known, Your Honor. Which of those components is not well-known? I would point to two aspects that are inventive. The first one would be the separation of the verification token database and the database apparatus. Mr. Worzen, did you hear my question? I listed apparatus, CPU, a data store, a memory, a storage, a database, and the Internet. Are any of those components not well-known in the prior arc? Your Honor, the architecture and the configuration of the two databases that I was referring to is novel and inventive. The other aspect would be the issuance of API keys to the apparatus of A. In Claim 1, this is claimed as the credential. Those two aspects are inventive in our novel and do go directly to the solution that Claim 1 is directed to. The prior arc, and the 308 patent goes into this, the prior arc suffered from the problem of tying access to digital content. This is Judge Chen. We understand that you have an argument. The argument is that there's something about the combination of all these claim elements that, in your view, amounts to an inventive concept. But I don't understand that to be Judge Wallach's question. Judge Wallach's question is there are certain components, individual components, presided throughout this lengthy claim. Examples like the apparatus, Element A, and CPU, and a database, and API communication. Each of those elements that I just presided, that are from the claim, all of those are conventional. Would you agree with that? In the sense that, if I could analogize to the EnFish case, Your Honors. In that case, the claim was directed to a self-referential database. Everyone would agree that a database in and of itself was not inventive. I would concede that Mr. Grisha did not invent API keys. He did not, of course, invent databases. But much the same way as in EnFish, the claim was directed to the solution, that being a new kind of database. What Mr. Grisha did here in Claim 1 is teach specifically how to organize, teaching the artisan how to organize these various components, which may have been invented already, but had never been used in this way. The claim itself is directed specifically at the solution to the problem that I was highlighting. That is, your digital content had been tied to the device itself. The solution, which every limitation in this claim is geared towards, is how do you associate a permission to the digital content with a trustworthy data point identifying someone's identification. If you walk through the claim, as we highlight in the brief, there are at least nine limitations, which were ignored, which teach precisely what you have to do to achieve this result. One question I had was I understand that your theme of your argument is that this claim convention permits what you refer to as interoperability, the ability to access some digital media content from a lot of different devices and not just one device. As I was reading through the claim, it wasn't so clear to me why that is so, given that all the limitations are really tethered to, quote-unquote, the apparatus of A. That is, the apparatus resided in limitation A. If anything, the claim feels like it's rooted to that particular apparatus. That is the means of accessing the digital media. Could you just quickly explain what is it about this claim convention that permits? If there's something you can show me in the claim that provides this interoperability result that you're referring to. Yes, Your Honor. I would point to the claim language itself and the definition of apparatus. Excuse me? Where? Appendix 55, column 14, starting at line 34 and down to line 44, the apparatus of A is defined. You'll see the detail provided to an apparatus of A. The claim itself does not limit the apparatus of A to, for example, a client device, which I think, Judge Chen, I think your question was getting at. Apparatus of A is not limited to the client device, but rather it is-the apparatus of A receives the access request, which is a write request to a data store, which, as the claim teaches, is a memory, a storage, or a database, quote, and the way the specification teaches the apparatus of A, in some embodiments, the apparatus of A is the content provider. And so the content provider is receiving, in the form of a write request, the verification token, which is a permission. Let me ask a different question. You know, I don't-we're losing time here. There's a-in the end, there's some data object that's created in this claim. Is that right? Correct, Your Honor. And then there's a where in clause at the very end of the claim? Correct. Does that-does somebody, in order to infringe this claim, do you have to perform the where in clause? Every-all the things that are recited in the where in clause? Yes, Your Honor. Okay. So the claim is not just for creating a data object. The claim also requires that you use the data object in the ways that are recited in the where in clause? That's correct, Your Honor. And a key element of this claim is that the claim seeks to- Why is that so when where in-you know, where in clauses are-I'm sure you're a patent lawyer, so you must know. They can be a rather mischievous thing in terms of understanding whether they get patentable weight or not. Because oftentimes they're just descriptions of the context of what the claim thing might actually be used for, but it's not actually an active limitation that gets any weight. And why is that so here? If you read the claim in full, the preamble says that this is a process covering the transformation of the access request to this computer-readable authorization object. Then the claim- Right. So you would think, therefore, that the end of the process, the claim process, is the creation of that data object itself, not the further application of that object in some other process. Well, if you go to the description, the definition of what that computer-readable authorization object is, and this is column 15, line 7-I'm sorry, 8. But it defines the attributes of this computer-readable authorization object, which grants subsequent access to the cloud digital content. And so a key point here is that the claim, the process, the computer-readable authorization object is one of authorization of access. Access is not granted, but this object can be used in the future to grant authorization- I'm sorry, grant access to the cloud digital content in the future. And so- Just looking at limitation F, what needs to be stored in this data object? Is it both the verification data and the received query data? Well, I asked because the claim just says at least one of, which means to me that this claim encompasses storing either verification data or query data or both types of data. But it doesn't require both. Does it- I- Does it require both? The language itself would support either or or both. Okay. So if you just stored nothing more than the received verification data, that's encompassed by this claim? I think that you could support that reading, Your Honor, with the claim language. Isn't that the prior art? No, that is not the prior art, Your Honor. And the reason we believe it's not the prior art and the Patent Office believes it's not the prior art is because of the separation of the two databases, the verification token database and the verified web service, as well as the trustworthy communication that the claim teaches in order to obtain the identification information. And so what would be prior art, Your Honor, is the first two steps. If there were nothing else, that is, receiving a request for permission to the content and authenticating it. But where the novelty is and where the solution is directed is obtaining the identification information through this trustworthy communication. That is, with a credential being assigned to the apparatus of A or the content provider, as it's taught, so that the content provider, the apparatus of A, can request and receive someone's membership account information or the verified web service account identifier. I think I'm into my robust... Yes, you are. Okay. I don't hear from Mr. Hawes. Thank you. We reserve the... Mr. Hawes. Thank you, Your Honor. Michael Hawes for the appellee, Samsung Electronics America. I'd like to start with a few of the points made in the questions in the back and forth. For example, there was the question about whether a database is a routine item, a known conventional item. And the response was that this was somehow a special database. And I'd like to point the court to the appendix, specifically at appendix page 52, which in column 8 from lines 53 to 56 discusses the databases and refers to a database with another database. So about as generic as you can get with respect to describing the databases.  So figure 3 through figure 5 in the appendix from pages 44 to 46. Also, just generic black box databases. And finally, in column 9, so now we're in appendix page 53, it says, according to an embodiment of the present invention, the tokens are stored in a relational database such as MySQL or Oracle. So even in a particular embodiment, all we really have is a relational database. Very conventional, very generic. There is no reference to a special database. These are standard computer components defined generically and very broadly. Judge Wallach, following up on your question about whether this claim is multi-device, certainly the preamble, as you pointed out, shows that the claim merely is discussing taking some data and processing it to create other data. And in fact, in the blue brief on page 30 in the summary of the argument, the appellant describes it in the same way. Claim 1 of the 308 patent transforms an access request for cloud digital content into a computer-readable authorization object. Start with data, create data. And what are the middle steps? The middle steps here are a number of conventional lookups and queries to databases. Now, we heard a lot in the briefing and a little bit here in argument about how Step C of the claim has six different steps for how you access API communication. But I would point the panel again to page 53 of the appendix in the patent. And in column 10, you'll see there's a discussion of what you have to do with regard to an API. Starting at line 12, an API is a set of routines, data structures, object classes, in order to support the building of applications. Importantly, it is very clear from the discussion here that the APIs are preexisting. They're meant for communication. They're meant to have the type of password protection, user name, the credentials that the appellant puts so much store in. And in fact, they're so conventional that even for an Internet type of conventional communication, the patent itself points at line 24 through 20, looks like 28, to a book from several years previous that, according to the patent, can give you more details about how to do an API communication. Mr. Hawes? Yes. This is Judge Chen. I think we can all agree that the various individual recited elements, CPU, database, APIs, they're all basic. That's fine. But as I'm hearing what the other side is arguing, it's how those elements are used and arranged to create some kind of access mechanism. That is the interesting thing here. And now we've created in this claim invention an improved access mechanism by combining different sources of data from different databases to create a trusted access mechanism. And so, really, I think it feels like that's where the issue may lie here, as to whether what has been created here is an improved access mechanism through combining data from different sources of data. So could you please speak to that? Happy to, Your Honor. I think we addressed in the brief this idea that you can get out of abstraction by collecting and storing data. And I think the district court judge actually did an excellent job in looking to data engines on this point. In the district court opinion, the district court looked at the data engine's opinion and said this opinion has both claims that the court, the Federal Circuit, found eligible and claims that it found ineligible. And, frankly, that makes data engines a very useful case for 101 analysis because it's one of the few cases that has that line drawn between the claims that are eligible and the claims that are ineligible. And in the data engine's case, the claim that was found ineligible, which, Your Honor, actually there were several, but the first one that's discussed, which is claim one of the 551 patents found in that case on pages 1011 and 1012, that claim has the same type of collecting multiple pieces of information and storing them in a particular way that, according to the specification, is useful. But that's the very claim that data engines found was ineligible because merely collecting data and storing it does not get you outside of abstractness when it's done using generic computer components. And not only is that the analysis that the district court went through saying, I'm looking at these different claims in data engines and finding that your one claim is closer to the ineligible ones. It's the analysis that's completely unrebutted in the briefing on appeal. The appellant never or certainly doesn't rebut any of the analysis of the district court with respect to the claims found ineligible in data engines. And there are other cases, such as the Intellectual Ventures case that we cited, as well as, I believe, the TCL case, where this same idea of just collecting data and storing a collection of data, that does not get you out of abstractness. And especially where here, you know, the district court correctly said, look, this is just using computers to do something very similar to what's been done in the past. As was pointed out in the questioning, the at least one limitation in that Claim 1 is such that this claim could even cover storing just the information that was provided in the request. I mean, there's really no requirement that this claim go beyond that. Now, the district court, you know, because this is a dismissal, the district court did its analysis assuming that both pieces of data were being stored as part of this object. But the reality is that this claim, using its at least language, doesn't require that. And while the appellant had asserted that it did, it sounds like now, during the oral argument, the appellant is now, you know, basically acknowledging that the claim doesn't even require that. I'd like next to hit that mischievous limitation that was discussed, which is that where in clause at the end of the claim. So, first of all, it's important to note that, as we just heard in the blue brief, as well as in the preamble, this last limitation is not described as what is claimed in Claim 1. Claim 1 describes that it's just transforming a request into an object. And the blue brief at page 30 mimics that. And I'd note that the Simio case, which was decided last week, and that case is, I'll give you the number for that since it was last week, I don't have a citation with respect to the federal reporter yet. But it's case number 20-1171. The Simio case actually had a similar kind of final limitation that was kind of left out when it came to the preamble and when it came to the plaintiff's description of what the importance of the claim was. And this final mischievous where in clause is similar. If you read that where in clause, first of all, it has no reference to multiple devices. It's referring back to the same generic apparatus with a CPU that we see in Clause A. And all it says is that the computer readable authorization object is processed in the apparatus using a cross-referencing action during subsequent user access requests to determine one or more of a user access permission for the cloud digital content. We never access the cloud digital content. We never do anything but determine a permission. And that's exactly what we did in Step B. Step B, which is the authenticating step, says, of course, that we use a database to verify this verification data. And that was construed to mean a permission. So when you read the where in clause closely, it's basically saying, we just went through these steps where we checked your request data. We went and did a database lookup. And we stored the results. Well, the next time you send us a request, we'll just use the stored results to process your request. That's it. It's really just a use what we stored so you don't have to go get it again. That is, just as in Simio, a final step that doesn't add to the abstract data processing detailed in the rest of the claim. So I want to obviously respond to any questions that the panel has. But I think the district court did a great job here. I think the district court looked at the right guidance. This is a data processing claim, as even the appellant has admitted in the blue brief. And it doesn't add anything because every piece of equipment is generic and used for its normal purpose. Thank you. Let's turn back to Mr. Warzen. You have three minutes of rebuttal time. Thank you, Your Honor. I'd like to pick up where Mr. Hawes just left off. I don't know why he's calling the where in clause mischievous. And I believe he's reading the claim incorrectly. And it goes to this issue I was trying to highlight at the start, which is that the claim seeks to create an object for authorization for access. We're not accessing the data. That is the prior art where verification tokens were submitted, authenticated, access was granted. What this is is a gatekeeping function creating this authorization object. And with subsequent processing of the authorization object, continually granting access gatekeeping function to the digital content, which is behind the gatekeeper. Now, with respect to only either or, either the verification token or the account identifier being written to the object, to infringe, you need to complete all the steps. And so it's not even if only the verification token is stored. An infringer or prior art that would purport to invalidate would need to perform each of the six steps, which you have to have the request and the receipt through a trusted source, through the credential which is assigned, and which I would note, Pally doesn't even use the word credential in their briefing. And that mirrors the district court's analysis, which just overlooks all of these many different limitations, which are required to achieve the solution to obtain membership account identifying information from a trusted source so that it can be associated with the permission to access digital content. And so that your gatekeeper, this computer-readable authorization object, can stand in the way between the user trying to subsequently access his or her digital content. Without questions from the panel... Mr. Lorzen, last question. Did you reach a settlement agreement with the banks, or did you just elect not to identify them under appeal from the district court decision? We were attempting to settle the matter, Your Honor. We ended up not settling it. However, the banks did file an IPR, which has subsequently been terminated. But that did go into the calculus on which of these appeals to take or not to take. And so I hope that answers Your Honor's question. Thanks. Thanks. Time's up. We thank both sides, and the case is submitted. That concludes our proceedings for this morning. Thanks. The Honorable Court is adjourned until tomorrow morning at 10 a.m.